## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HENRY LORTHE, Inmate No. 281-693 | : | |
| McDougall Correctional Institution | | |
| Suffield, Connecticut | : | |
| | | |
| Petitioner, | : | |
| | | **CIVIL ACTION NO.** |
| v. | : | |
| | | **3:01-CV-001479-AWT** |
| WARDEN, | : | |
| | | June 25, 2008 |
| Respondent. | : | |

## AMENDED APPLICATION FOR A WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254
## BY A PERSON IN STATE CUSTODY

Yves Henry Lorthe, a person under the custody and control of the Connecticut

Department of Corrections pursuant to a judgment imposed by the Superior Court of Connecticut

for the Judicial District of Stamford/Norwalk, petitions, by and through undersigned counsel and

in accordance with 28 U.S.C. § 2254, the Rules Governing Section 2254 Cases in the United

States District Courts and Local Civil Rule of Procedure 8, to vacate the conviction and sentence

imposed in the State matter for which he is presently serving a term of imprisonment.  For the

reasons set forth herein, Petitioner's confinement is unlawful because the judgment of conviction and

court order committing him to the custody of the Commissioner of Correction, as overseen by the

Respondent, rests upon the deprivation of his constitutional right to the effective assistance of counsel

under the Sixth and Fourteenth Amendments to the United States Constitution as well as the

deprivation of his constitutional right to due process under the Fifth and Fourteenth Amendments to

the United States Constitution in that Petitioner did not knowingly, intelligently and voluntarily plead

guilty (if at all).  In support of this motion, Petitioner, by undersigned counsel, states as follows:

<u>FACTUAL ALLEGATIONS, INCLUDING PROCEDURAL HISTORY</u>

1.  Petitioner Yves Henry Lorthe ("Henry Lorthe") is a 30-year-old Haitian national.  He grew up in Port-au-Prince amidst abject poverty and endemic violence.[1]  The home he shared with his mother, three siblings and two other family members was little more than a large room that lacked either electricity or plumbing.  From an early age Petitioner was a forced witness to untold atrocities and innumerable violent acts, as warring political factions and street gangs ran roughshod over the country and his community.  Petitioner broke away from this systemic chaos at age 16, when his father, who left Haiti when Petitioner was two years old, sent for him, his mother and his siblings.  Petitioner came to live in Stamford, an environment to which he had

---

[1]  Jean-Claude Duvalier (<u>a.k.a.</u>, "Baby Doc") ruled Haiti, the poorest nation in the Western hemisphere, from 1971 until he was overthrown by political uprising in 1986.  Following Duvalier's departure, a Central Intelligence Agency-sponsored anti-narcotics service, the National Intelligence Service (S.I.N.), was created.  <u>See</u> <u>C.I.A. Formed Haitian Unit Later Tied to Narcotics Trade</u>, NY Times (Nov. 14, 1993) ("agency was staffed solely with officers of the Haitian Army, which was already widely perceived as an unprofessional force with a tendency toward corruption") (available at <u>http://query.nytimes.com/</u> gst/fullpage.html?res=9F0 CE0D81138F937A25752C1A965958260).  S.I.N. morphed into a criminal narcotics enterprise and paramilitary death squad that suppressed popular movements by means of torture and assassination.  <u>See</u> <u>Id.</u>; Alan A. Block, <u>The National Intelligence Service – Murder and Mayhem: A historical account</u>, 38 Crime, Law and Social Change 2 (Sept. 2002).  Jean-Bertrand Aristid was elected into office in December 1990.  Aristad served only eight months (February-September 1991) before being overthrown by a military coup d'état headed by General Raoul Cédras.  The Cédras junta, which governed the next four years, used violence as a tool of repression.  For instance, the Front for the Advancement and Progress of Haiti (FRAPH), a paramilitary death squad that organized in mid-1993, terrorized Aristide supporters by murder, massacres, public beatings, arson raids on poor neighborhoods and severing limbs by machete.  A multinational military force restored Aristad to power in August 1994.  <u>See</u>, generally, Alex Dupuy, <u>The Prophet and Power:  Jean-Bertrand Aristid, Haiti, and the International Community</u> (Rowman & Littlefield 2007); J. Christopher Kovats-Bernat, <u>Sleeping Rough in Port-au-Prince: An Ethnography of Street Children and Violence in Haiti</u> (University Press 2006); Philippe Girrard, <u>Paradise Lost: Haiti's Tumultuous Journey from Pearl of the Caribbean to Third World Hotspot</u> (Palgrave Macmillan 2005); Howard W. French, <u>Port-au-Prince Journal: Boldy, Duvalier Bullies Step From the Shadows</u>, NY Times (July 20, 1990) ("With the country's army torn by violent internal feuds and democratic leaders mired in political squabbles, the historical leaders of the feared Haitian militia, the Tontons Macoute, and other barons of the Duvalierist state are again on the move, using intimidation and an old-fashioned appeal to race to bully and outflank their enemies."); <u>http://www.haitianalysis.com/</u>.

difficulty adjusting.  Petitioner graduated high school (through the assistance of a home tutor) notwithstanding reported learning difficulties.  Additionally, while he is able to speak and understand English despite being a native Creole speaker, Petitioner lacks confidence in his ability to understand "courtroom English" or legal concepts.  See Exhibit (Ex.) A, PA1-3.[2]

2.  By virtue of a judgment of the Superior Court of Connecticut for the Judicial District of Stamford/Norwalk (John Kavanewsky, J.), Mr. Lorthe is presently committed to the custody of the Connecticut Department of Correction ("DOC").  State v. Lorthe, Docket No. CR00-0132150-S.  He is housed at the McDougall Correctional Institution in Suffield, Connecticut.  His maximum release date is March 29, 2027, and his inmate number is 281-693.

3.  On March 29, 2000, at approximately 9:46 pm, Henry Lorthe fatally stabbed his cousin Jean Rene Bernadel following a series of confrontations/altercations between Bernadel and members of the Lorthe family — first outside the family's home and then on Lawn Avenue in Stamford.

4.  At approximately 10:08 pm on March 29, 2000, Petitioner turned himself over to authorities at the Stamford Police Department.  Specifically, he walked into the front lobby of police headquarters and, after being motioned over by officers, replied to the question, "Can I help you?" with "Someone hit my mother.  I got mad and stabbed him," then repeating "I just stabbed someone."  Unprompted, Petitioner held out his hands.  Police handcuffed Petitioner and escorted him to the lockup.  During the short walk, he reportedly kept saying:  "He pushed my mother.  I have a temper, and I stabbed him.  I stabbed him."  Thereafter, police advised Petitioner of his rights, and he gave a statement, which police wrote down and he signed.  In that statement, Petitioner asserted, inter alia:

---

[2]  Given the volume of attached exhibits, Petitioner's appendix ("PA") is numbered for ease of reference.

(a)  That while in the family home earlier that evening, he heard his mother outside say, "Why you hit me?"  Looking out the window, he observed a group of individuals, including his parents.

(b)  After retrieving a knife from the kitchen, which he placed in his back pocket, Petitioner [5'9" and approximately 160 pounds] went outside, where he witnessed Bernadel [5'8" and 239 pounds] push his father to the ground.  Petitioner said to Bernadel:  "Why are you arguing with my parents?  They're old people.  Why don't you walk away?"  The two then argued, and in leaving the area via automobile Bernadel told Petitioner:  "I'm going to kill you."

(c)  Petitioner drove off in an effort to cool down, though keeping the knife for protection.  Approximately five-to-seven minutes later, Petitioner saw his mother on Lawn Avenue with a group of people.  When he turned down the street, Petitioner observed Bernadel's car.  Exiting his car, Petitioner heard Bernadel arguing with his mother.

(d)  Petitioner ran toward Bernadel knife-in-hand.  During the course of the ensuing chase (Bernadel ran), Bernadel picked up a large rock and stopped.

(e)  Petitioner stabbed Bernadel in the chest and fled the scene immediately, driving away.

Ex. B, PA7-10.[3]  According to officers present when the statement was taken, Petitioner constantly stated "he hit my mom and said he was gonna kill me, I did what I had to do" as well as "every time my brother gets in trouble, it's because of Bernadel."

4.  At 3:09 am on March 30, 2000, police interviewed Petitioner again, though his purported statement was not reduced to a signed writing.  During said interview, Petitioner

---

[3]  This exhibit has been redacted to remove Petitioner's date of birth and legal address.

reportedly acknowledged having two knives and running after Bernadel with a knife in each hand. The handle of the smaller knife reportedly broke when Petitioner struck Bernadel's hand.

5.  Over several days, investigators took six written statements at the Stamford Police Department from purported eyewitnesses[4]:

(a)  On March 29, 2000 at approximately 10:30 pm, Prayon Truesdale (a.k.a., Precious), then age 24, told police that she traveled from Bridgeport to Stamford that afternoon to spend time with friends.  One of these friends, Wilson, lived on the third floor of the building in which Petitioner's family resided.  Approximately one hour after Truesdale arrived at Wilson's, their friend Alex came in with "Biggie" [Jean Rene Bernadel].  It was about 9:22 pm.  Intending to catch the 9:51 train, Truesdale left in unison with the other three.  When the group reached the second floor, Bernadel had words in a foreign language with Mimose Lorthe, his aunt and Petitioner's mother.  Mrs. Lorthe's body language suggested she was mad, and Wilson told Truesdale that Mrs. Lorthe was upset because she did not want her son who had just gotten out jail [Jean Lorthe] to get into trouble.  Truesdale and Wilson continued to the car trailed by Alex and Bernadel, whom Mrs. Lorthe followed and continued to yell at.  Bernadel said "Fuck you" to Mrs. Lorthe, at which point someone who seemed to be Mrs. Lorthe's husband ran out of the home and struck Bernadel with what appeared to be aluminum siding that he had picked up from the ground.  Petitioner came outside, yelled at Bernadel and "started a little scuffle" before Alex intervened.  Bernadel went to his car while Petitioner re-entered the home.  Petitioner reemerged, placing something in his back pocket.  Truesdale, Wilson and Alex all entered Alex's car and, at Truesdale's suggestion, followed Bernadel, who

---

[4]  In providing the following witness statement summaries, Petitioner does not concede their accuracy.  Indeed, they are replete with inconsistencies.

had stopped nearby.  Bernadel was speaking with "five or six other black guys."  Alex and Wilson joined that group while Truesdale remained in the car.  Mrs. Lorthe came walking down the street and, eventually, talked to Bernadel.  Approximately five-to-seven minutes later, Petitioner pulled up and got of his car, proceeding to run at Bernadel with knife-in-hand.  Petitioner hit Bernadel with the knife and kept stabbing him until, approximately 30-seconds-to-a-minute later, he stabbed Bernadel one last time with an overhead motion.  Bernadel fell to the ground.  Petitioner dropped the knife, returned to his car and drove away.

(b)  On March 29, 2000 at approximately 10:35 pm, Wilsam Coriolan[5], then age 25 and living on the third floor of the same building as the Lorthes, told police that Jean Rene Bernadel stayed home from work that day in order to pick Petitioner's brother Jean Lorthe up from jail.  Coriolan and Alex Deus worked that day until around 4:00 pm, returning after to Coriolan's apartment.  Deus stayed for about 20 minutes before heading home.  Approximately two hours later, Deus returned to the apartment with Bernadel.  At some point, the group left and, heading downstairs, encountered Mrs. Lorthe.  She inquired about Jean's location and accused Bernadel of getting Jean in trouble, screaming real loud.  Additionally, "[s]he was saying stuff in Creole like 'Fuck you', 'I hate you' and stuff like that."  Bernadel kept his composure and walked toward his car when, "out of nowhere", Petitioner's father appeared and hit Bernadel with "some kind of metal thing."  Petitioner then came out of the house wanting to fight Bernadel, "jumping around real aggressive" and saying things.  Bernadel got in his car and left, and Coriolan, Deus and Truesdale got in Deus's car and left.  The latter group drove to Bernadel's house on Lawn

---

[5] It appears that Mr. Coriolan is the "Wilson" referenced in Ms. Truesdale's statement, and others.

Avenue, where Coriolan observed Bernadel speaking with Jean.  Coriolan and Deus joined

them and were speaking for approximately ten minutes before Coriolan saw Mrs. Lorthe

walking towards them looking for Jean.  At some point, Petitioner drove up from the

direction of East Main Street.  Petitioner parked quickly, got out fast and pulled out two

knives, holding "one in each hand."  Petitioner chased Bernadel and, upon catching up

with him, "stabbed him a lot of times," the last time "between his chest and his throat."  "It

was a big knife" that Petitioner left stuck in Bernadel before getting into his car and

leaving.

     (c)  On March 29, 2000 at approximately 11:07 pm, Alex Deus, then age 24, told

police that around 9:00 pm that evening, he, along with Renee Bernadel and Precious,

where at Wilson's apartment.  As the four were walking down the hall to leave, Mrs.

Lorthe approached Bernadel, accusing him of being a bad influence who got her son Jean

in trouble and made him go to jail.  Mrs. Lorthe then cursed at Bernadel before

Petitioner's father came out of the house and hit Bernadel twice in the arm with a metal

pole; it did not look like it hurt too bad.  Petitioner then came out of the building wanting

to fight Bernadel.  Bernadel got into his car, and Deus got into his car with Wilson and

Precious.  Deus tried to follow Petitioner, who was seen going back into the building

before driving off.  But, after losing Petitioner, Deus drove to Lawn Avenue, where

Bernadel lived.  Deus saw Bernadel explaining to Jean Lorthe how his mother had

disrespected him (Bernadel) and that Jean needed to calm his mother down.  Mrs. Lorthe

walked over and said she would hit Bernadel if he said anything.  As the group was

talking, Petitioner pulled up in his car and got out with two knives — one in each hand.

One was 12 inches long and the other six-to-seven inches.  Deus told Bernadel to run, and

Petitioner began chasing him. Bernadel walked backwards away from the Petitioner, but he slipped and fell. Petitioner then came through with the knife in his right hand and stabbed Bernadel in the throat. Bernadel remained on the ground while Petitioner ran to his car and left. Mrs. Lorthe walked away, but Jean Lorthe stayed.

(d) On March 30, 2000 at approximately 2:40 pm, Mimose Lorthe, then age 46, told police that between 7:00 pm and 8:00 pm on the preceding evening, she was in her home with her husband and five-year-old daughter when she heard Petitioner outside arguing with his cousin Jean Rene [Bernadel]. Looking outside, Mrs. Lorthe observed the two in a nearby parking lot outside their respective cars. She went out to investigate followed by her husband. Mrs. Lorthe confronted Bernadel, intervening and trying to hold him back. Bernadel pushed her, causing her to fall on the ground hitting her spine. Mr. Lorthe then made a Creole hand gesture indicating to Bernadel to go home, but Bernadel responded by pushing Mr. Lorthe to the ground. According to Mrs. Lorthe, "In Haiti, the worst thing you can do is to hit an elderly person." Petitioner then questioned Bernadel as to why he had hit "an elder." As Bernadel went to his car, he said something like "De-Katouch, on you ass!" An upset Petitioner also left in his car. Mrs. Lorthe returned home with her husband. Between 10:00 pm and 11:00 pm, Petitioner called home advising that he was in prison, stating: "I fought with Jean Rene because your elders and for being elder he had no right pushing you's. I got into a fight with Jean Rene, I stabbed Jean Rene." Mrs. Lorthe recalled no prior difficulties between her son and nephew. Also, she did not remember seeing any weapons.

(e) On March 31, 2000 at approximately 3:41 pm, Jessica Putzig, then age 18, told police that as she was walking to her home on Lawn Avenue "a couple days ago"

when a car carrying four Haitian men, two of whom she knew, stopped to talk to her.  A
second, gold car carrying a male and female then pulled up.  All the people began speaking
to each other in Haitian.  The gold car pulled away and a small blue car carrying a Haitian
male pulled up.  The driver got out and went over to the white car, asking to speak with
"JB."  A person got out of the white car and began arguing with the other man in Haitian.
 "They were swearing at each other."  Putzig proceeded in her home and, five-to-ten
minutes later, heard someone say a guy got stabbed.  Pushing through the crowd, Putzig
identified the guy who had gotten out of the last car as the stabbing victim.

    (f)  On March 31, 2000 at approximately 7:25 pm, X, then age 11, told police that
on Wednesday between 8:30 pm and 8:45 pm, she was walking home with her friend
Jessica Putzig when a white car carrying three or four people pulled up to talk to Jessica.
As Jessica was talking, a blue car carrying "Biggie" pulled up.  "Biggie" got out and began
yelling at the driver of the white car in Creole and English before yelling at somebody in
the back seat.  Biggie instructed the person in the back seat to get out, which prompted
everyone to get out.  There was arguing for five-to-ten minutes before a rusty goldish car
pulled up, with a guy and girl getting out and telling everyone to "shush, shush, squash it."
 "Biggie" kept yelling and pointing in everyone's face.  Approximately 15-to-20 minutes
later, a maroon car pulled up fast and a light-skinned Haitian with corn rows got out.  He
had something big behind his back that was long and silver, and he yelled at "Biggie" in
Creole.  "Biggie's" eyes got big, and he started shaking his head.  With "Biggie" saying
"no" and running away, the guy went after him.  Out of nowhere, a woman who appeared
to be in her 40s got between "Biggie" and the guy with her hands out trying to separate
them.  "Biggie" started backing up, and the guy switched what was then seen as a knife

from his left to right hand. "Biggie" ran, and the guy chased him. X looked away. She next saw "Biggie" slip in mud next to the telephone pole and fall on his back. The other guy then got up on "Biggie" and was standing over him before stabbing "Biggie" in the chest, leaving the knife inserted as to ran to his car and took off.

6. Police reports also reflect statements that were not reduced to writing and/or signed by the declarant:

(a) On March 29, 2000, police interviewed Alguy Blanc, then age 22, who advised that Petitioner had come to his house earlier in the evening to request a ride to the police station. Blanc said that he drove Petitioner downtown in a friend's car.

(b) On March 30, 2000, police interviewed Ernest Lorthe, Petitioner's father who suffered from vision difficulties, at the Stamford Police Department. Mr. Lorthe, through a Haitian/Creole interpreter, reportedly told police an account similar to his wife's, namely that they were in their home when they heard the argument outside between Petitioner and Bernadel and that when they went out to inquire further Bernadel pushed them to the ground. Mr. Lorthe also told police that he and his wife had hired a limo on March 29, 2000 to take them to the prison from where their son Jean was released, and that the three drove back in the limo to Stamford together.

7. During a search of the scene on the night of March 29/early morning of March 30, 2000, police retrieved a kitchen-type with an eight-inch blade a short distance from an apparent blood stain on the ground where Bernadel had been found and, separately, a kitchen-type knife with a brown handle and broken blade several feet away. Police also retrieved a rock.

8. Police responding to the Stamford Hospital Emergency Room reported that medical personnel listed 10:20 pm as Jean Rene Bernadel's time of death. Between 10:25 pm and

10:28 pm police inventoried Bernadel's property, which included, inter alia, one thousand fifty

dollars ($1,050) in denominations of $50.00 (17) and $100.00 (2) bills in the left front pants

pocket as well as a cellular phone and a pager.

9.   The Medical Examiner's Report, which memorialized an autopsy conducted on March

30, 2000, confirmed that Jean Rene Bernadel died of a single stab wound to the chest, nine inches

deep and the entrance of which was 15 inches down from the top of the head and a half-inch to

the left of midline.  The report listed no other injury(ies).

10.   On March 30, 2000, Henry Lorthe was presented before the Connecticut Superior

Court for the Judicial District of Stamford/Norwalk—Geographical Area #1.  He stood charged

by short-form Information with Murder in violation of Connecticut General Statutes § 53a-54a.

The Court (Bingham, J.) found probable cause, set bond at one million dollars ($1,000,000) and

appointed the Public Defender's Office to represent Petitioner.  The matter was then transferred

to Part A, that is, to the major felony docket for the Stamford/Norwalk Superior Court.

11.   On April 3, 2000, the State filed a long-form Information charging Petitioner with

Murder in violation of General Statutes § 53a-54a, alleging that he "did stab and cause the death

of JEAN RENE BERNADEL."  Under Connecticut law, a violation of § 53a-54a carries a

mandatory minimum sentence of 25 years' imprisonment.

12.   On April 19, 2000, Public Defender Susan M. Hankins entered an appearance on

Petitioner's behalf.  On information and belief, in the course of her representation, Attorney

Hankins undertook a series of efforts to investigate the merits of Petitioner's case and potential

defenses while concurrently working toward securing a favorable non-trial resolution should

Petitioner elect such a disposition.  As an example, the Public Defender's Office began

interviewing potential witnesses the day after the underlying incident and continued in those

efforts throughout its involvement in the case.  It also looked into Petitioner's background, including family background.  Additionally, Attorney Hankins established lines of communication with the victim's family (also part of Petitioner's extended family) to help build support for a possible guilty plea whereby Petitioner would not be subject to the 25-year term of imprisonment attendant to a murder conviction.  In this regard, during a pretrial conference(s) concerning Petitioner's case, the State inquired about his willingness to plead guilty to manslaughter in violation of General Statutes § 53a-55 in return for an agreed upon 20-year sentence, the statutory maximum.  That offer was never firm due to the fact that Petitioner did not authorize Attorney Hankins to make such an agreement on his behalf.  Ex. C, PA 21.  However, Attorney Hankins felt fairly confident that she could formalize such an agreement, if permitted, given her contacts with the victim's family.

13.  On or about May 4, 2000, Petitioner entered a plea of not guilty.

14.  On or about July 11, 2000, Petitioner's parents retained Attorney Gary Mastronardi of Bridgeport to represent him.  By the terms of the parties written fee agreement, the total fee for Attorney Mastronardi's services was $30,000 (flat), with $15,000 to be paid up front and an additional $15,000 if the case proceeded to trial.  Ex. C, PA 23.  On information and belief, the Lorthes paid Attorney Mastronardi $10,000 initially and made no further payments for attorney services.  Ex. D, PA48, 52.

15.  On August 23, 2000, Attorney Mastronardi entered his appearance in lieu of the Public Defender's Office.  Petitioner met Attorney Mastronardi for the first time on that court date.  Ex. A, PA 4.  They spoke for less than 20 minutes in the courthouse lockup, and Petitioner recalls no discussion of the merits of the case.  Id.

16. On information and belief, the Public Defender's Office turned over a complete copy of its file to Attorney Mastronadri, which included police reports, witness statements, the medical examiner report and its investigator reports.

17. On information and belief, Attorney Mastronardi did not employ the services of a private investigator or undertake any substantive, independent investigation as to the merits of the State's case or potential defenses available to Petitioner (beyond the Selig evaluation, infra).

18. On information and belief, Attorney Mastronardi did not communicate substantively with Petitioner concerning his version of events, his questions and concerns about the merits of the State's case or potentially available defenses, or his background (e.g., social history, education, medical and mental health, employment record) for development of information that might, inter alia, facilitate a favorable plea agreement or a mitigated sanction. Attorney Mastronardi met with Petitioner three times: on August 23, 2000, on the day of the change of plea hearing (infra) and on the morning of sentencing (infra). Ex. A, PA 4-5. Each of these meetings took place at the courthouse lockup, and none lasted more than 20 minutes. Id.

19. Attorney Mastronardi did engage in plea negotiations with the State, attempting, among other things, to secure an offer to a plea of Manslaughter. According to Attorney Mastronardi, the State's offer remained steadfast: if Petitioner wished to plead guilty, it would have to be to Murder, an offense that carries a statutory mandatory minimum sentence of 25 years' imprisonment. The State's position was reportedly influenced by a letter from the victim's parents to the prosecutor requesting that Petitioner "receive the heaviest sentence possible under the law." Ex. D, PA49.

20. On information and belief, Attorney Mastronardi did not reach out to or communicate with the victim's family to enlist support for leniency, nor did he contact or otherwise request the

assistance of the Public Defender's Office to ascertain with who they had been in contact or to determine why the victim's family was otherwise predisposed at an earlier stage in the case.

21.  In a purported effort to determine whether Petitioner's case could be tried with an eye toward securing a manslaughter conviction, on or about November 24, 2000, Attorney Mastronardi referred him to Kenneth M. Selig, M.D., J.D., for a psychiatric evaluation. Ex. D, PA49; Ex. C, 29[6].  Attorney Mastronardi sought to assess the viability of an "extreme emotional disturbance" defense.[7]

(a)  Petitioner's family paid one thousand dollars ($1,000) through Attorney Mastronardi's office for the evaluation.  Ex. D, PA49; Ex. C, PA30.

(b)  In addition to reviewing the Public Defender's investigator reports; the autopsy report; school records; a police report dated March 30, 2000; and Department of Correction records, Dr. Selig met with Mr. Lorthe for one hour and fifteen minutes, on

---

[6]  This portion of Exhibit C, which was an exhibit to Petitioner's pro se state habeas petition, has been redacted to remove Petitioner's date of birth.

[7]  "Extreme emotional disturbance is an affirmative defense to murder and is codified in {Connecticut General Statutes} § 53a-54a (a), which provides in relevant part that 'it shall be an affirmative defense [to murder] that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be ....'  We have previously offered guidance on the application of the defense in State v. Zdanis, 182 Conn. 388, 390-91, 438 A.2d 696 (1980) ('In determining whether the defendant has established the affirmative defense of an extreme emotional disturbance by a fair preponderance of the evidence as a mitigation of murder to manslaughter, the trier of fact must find that:  [a] the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; [b] the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and [c] the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions.  Consideration is given to whether the intensity of these feelings was such that his usual intellectual controls failed and the normal rational thinking for that individual no longer prevailed at the time of the act.'), cert. denied, 450 U.S. 1003, 101 S.Ct. 1715, 68 L.Ed.2d 207 (1981)." State v. Aviles, 891 A.2d 935, 952 n.15 (Conn. 2006).

December 12, 2000, at the Walker Correctional Center.  Ex. C, PA32; but see Ex. A, PA

5 (questioning purported length of meeting).

      (c)  During said meeting, Dr. Selig did not question Petitioner regarding the

circumstances surrounding the offense or his admissions to police, nor did he inquire of

Petitioner's background beyond questions related to his schooling in Connecticut.  For

reasons unknown, Dr. Selig questioned Petitioner concerning his feelings about

homosexuals.  Ex. A, PA5.

      (d)  Based on his review of materials and interview, Dr. Selig opined in a two-page

report dated January 2, 2001 — the first page of which effectively summarized the

materials reviewed — that Mr. Lorthe "would have a very hard time sustaining a defense

of extreme emotional disturbance."  Ex. C, PA32.[8]

      (e)  Dr. Selig's report makes reference to "explosive disorders."  Ex. C, PA33

(emphasis added).  On information and belief, "Intermittent Explosive Disorder," which

Dr. Selig expressly could not be certain Petitioner suffered from, falls under the rubric of

Impulse Control Disorders within the American Psychological Association's Diagnostic

and Statistical Manual of Mental Disorders-IV (1994).  Id.  It is unclear whether Dr. Selig

ruled out other disorders, such as Post-Traumatic Stress Disorder, before referencing

"explosive disorders," or whether he could have done so meaningfully given his failure to

inquire or otherwise investigate Petitioner's past, especially his upbringing in Haiti.

      (f)  It is similarly unclear from the report whether Dr. Selig had any opinion

concerning Petitioner's "underlying paranoia and suspiciousness" beyond their potential

---

[8]  Based on the foregoing, it appears that Dr. Selig reviewed case materials, traveled to/from
Walker CI, met with Petitioner for over one hour and prepared a report for the flat fee of $1,000.

relationship to an Intermittent Explosive Disorder that he could not diagnose.  Ex. C, PA33.

(g)  Given that Petitioner reported "numerous" prior head injuries, Dr. Selig opined that his "history of explosive disorders may be related to brain damage which could be more fully explored with psychological testing."  Ex. C, PA33 (emphasis in original).  However, inasmuch as Petitioner did not report losing consciousness and Dr. Selig did not find any "significant cognitive problems" in the hour or so that they met, Dr. Selig opined that there was a "low likelihood that we would find evidence of brain damage" after further testing, such as an MRI or psychological and neuropsychological testing.  Id.  It is unclear from his report whether Dr. Selig believed psychological testing might have more fully informed or otherwise influenced his diagnostic impressions of a 23-year-old man with a limited criminal history who stood accused of murdering a family member in the context of a familial dispute.

(h)  On information and belief, Attorney Mastronardi made no effort to secure further testing or evaluation.  To the extent that Petitioner and his family did not possess the financial resources to pursue additional testing, defense counsel did not apply to the Court for authorization to retain necessary experts.

22.  On February 23, 2001, Attorney Mastronardi pre-tried Petitioner's case, that is, he engaged in off-the-record plea negotiations with the State and the Court (Kavenewsky, J.).  The State's offer was a guilty plea to Murder, with the State recommending 30 years' imprisonment.  The case was continued until March 16, 2001 to permit Attorney Mastronardi the opportunity to discuss the offer with Petitioner.  Attorney Mastronardi wrote Petitioner that same day outlining the foregoing, and mistakenly suggesting that the Court was willing to sentence Mr. Lorthe to 25

years' imprisonment if he pled guilty.  Ex. C, PA35-36.  (Attorney Mastronardi later learned that the Court would allow Petitioner to argue for 25 years but would cap the sentence at 30 years' imprisonment; Ex. D, PA50-51).

23.  On information and belief, Attorney Mastronardi did not meet with Petitioner prior to March 16, as was his purported intention.  Ex. C, PA36.  Rather, Attorney Mastronardi next met with Petitioner on April 16, 2001, again in the lockup at the Stamford/Norwalk courthouse.  Ex. A, PA4.  That approximate 15-minute meeting was the first and only time that Attorney Mastronardi spoke with Petitioner about the State's offer and his options.  Id.  Attorney Mastronardi advised Petitioner to accept the State's offer, telling him that he would lose if he went to trial and likely receive 60 years' imprisonment.  Id.; see Ex. D, PA50.

24.  On April 16, 2001, Mr. Lorthe appeared before the Court (Kavanewsky, J.) for purposes of a change of plea hearing.  By the terms of the underlying, oral offer, the State recommended a sentence of 30 years' imprisonment while leaving Mr. Lorthe free to argue for a lesser sentence subject to the 25-year mandatory minimum associated with the offense of conviction.

(a)  The first question presented to Petitioner by the Court (clerk) is how he pled to the single-count Information under which he stood charged with Murder.  Ex. J, PA93-94.  Petitioner responded, "Yes," as he believed that it is what Attorney Mastronardi, who was talking him through the process, wanted.  Id.; Ex. A, PA5.  As he understood the legal concept, Petitioner did not believe himself guilty of murder.  Ex. A, PA5.  He believed that, at most, he was guilty of manslaughter.  Id.

(b)  After the State provided a factual proffer and confirmed that it was recommending 30 years' imprisonment, the Court noted its willingness to consider a 25-year sentence before setting about to canvass Petitioner.  Ex. J, PA94-95.

(c)  During the course of the canvas, Petitioner asserted that he was 23 years old, had completed the twelfth grade and was not taking any medication.  Ex. J, PA95-96.  He further affirmed that he had sufficient time to confer with counsel about his "guilty plea"; that he was satisfied with counsel's advice and representation; that he had discussed with counsel the elements of the offense and the State's evidence; that he understood what the State would have to show to prove murder; that he understood the mandatory minimum and the maximum penalties; that he understood that by "pleading guilty today" he was waiving assorted rights afforded defendants who proceed to trial; that he might suffer immigration consequences as a result of his conviction; that he understood the State's plea offer and the Court's position with respect to what sentence might be imposed; and that nothing had been promised to him beyond what the Court had "just said".  Ex. J, PA96-100.

(d)  The Court did not address Petitioner personally regarding the elements of Murder, or his understanding thereof.[9]

(e)  When asked, Petitioner said he had "no" questions regarding the "plea agreement" and that the "plea agreement" described was one he wished to accept.  Ex. J, PA100.  Petitioner also affirmed that the State's rendition of facts was "substantially correct."  Id., PA100-01.

---

[9]  But see, CT Practice Book § 39-19(1).

(f)  The Court thus made the following finding: "this defendant's plea is voluntarily and understandingly made with the assistance of competent counsel, there's a factual basis for the plea.  The plea is accepted and a finding of guilty shall enter."  Ex. J, PA101-02.

(g)  Nothing in record suggests that Petitioner waived his right to appeal through whatever oral agreement defense counsel entered into with the State on his behalf.

25.  A presentence investigation report was ordered.  Petitioner met with a probation officer for purposes of the presentence interview.  Defense counsel did not attend said meeting.

26.  Petitioner appeared for sentencing, on June 13, 2001.  Prior to that hearing, he met with Attorney Mastronardi for the third and final time in the approximate 11 months of Attorney Mastronardi's representation.  Ex. A, PA5.

27.  Defense counsel filed no submissions prior to sentencing (e.g., sentencing memorandum, collection of character letters) suggesting, inter alia, why the mandatory minimum 25 years' imprisonment was a sufficient penalty given the considerations relevant to the disposition of Petitioner's case.  At the hearing, counsel did present a handwritten letter from Petitioner expressing remorse, which the Court appeared to review for the first time that day, and a brief statement from Petitioner's father that was read into the record by Petitioner's sister.  Ex. G, PA70, 76-78.  Meanwhile, Attorney Mastronardi's allocution focused primarily on the circumstances of the offense; he said nothing about Petitioner's childhood or upbringing in Haiti beyond his having grown up in a "Christian home" and that he believed individuals should respect their elders.  Ex. G, PA72-76.

28.  Having heard from counsel, Petitioner and the Victim's Advocate, the Court (Kavanewsky, J.) sentenced Mr. Lorthe to 27 years' imprisonment.  Ex. G, PA80.  The Court then stood in recess.

29.  No direct appeal was taken of the conviction or sentence.  Mr. Lorthe's conviction thus became final on July 3, 2001.

**30.**  On of before August 7, 2001, Petitioner mailed a <u>pro</u> <u>se</u> Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 By a Person in State Custody, which was entered into the docket for the District of Connecticut under the above-captioned case name and number on August 8, 2001.  (Doc. 2).[10]

**31.**  On or about September 5, 2001, Petitioner moved to withdraw this <u>pro</u> <u>se</u> application or, alternatively, to have the Court stay the case pending exhaustion of state remedies. (Doc. 3).

**32.**  On or about September 13, 2001, the Court denied the Motion to Withdraw and granted the Motion to Stay.  (Doc. 4).

33.  In or about November 2001, Petitioner filed a complaint with the Statewide Grievance Committee concerning Attorney Mastronardi's representation.  Attorney Mastronardi responded by letter dated December 4, 2001.  Ex. D, PA48-52.

34.  On or before November 26, 2001, Petitioner filed a <u>pro</u> <u>se</u> state Petition for Writ of Habeas Corpus that was docketed, on December 3, 2001, in the Hartford Superior Court as <u>Lorthe v. Warden</u>, CV-01-0813116-S.[11]  Ex. C, PA11-47.  The petition challenged the legality of his conviction and raised numerous claims for relief, including:

---

[10]  To help alleviate confusion, Petitioner has highlighted (in bold) those paragraphs dealing with pleadings and actions taken in this federal habeas case.

[11]  On information and belief, Petitioner's <u>pro</u> <u>se</u> pleadings have been drafted with the assistance of individuals with whom he is incarcerated and also without possessing, at different points, the entire record, such as hearing transcripts.  Additionally, the state presentence investigation report,

- that his "guilty plea" did not comply substantially with Connecticut Practice Book §§ 39-19 and 39-20;

- that his "guilty plea" was taken in violation of the due process requirement of the fifth amendment, enforceable through the fourteenth amendment to the United States Constitution;

- that he was denied his right to effective counsel in violation of the Sixth Amendment to the United States;

- that the individual who evaluated him for purposes of identifying mitigating information (Dr. Selig) was provided no information concerning his childhood, culture and family background in Haiti and that Attorney Mastronardi made no effort to obtain such information;

- that Dr. Selig did not discuss with him his upbringing, culture or family history in Haiti or the night of the incident in question; and

- that Attorney Mastronardi may have suffered from a conflict arising from Petitioner's family's inability to pay the agreed upon fee or for additional cognitive and psychological testing, which warranted his withdrawal from the case.

35. Petitioner raised none of the foregoing claims (para. 35) via direct appeal (see para. 29). He did not, however, deliberately bypass a direct appeal to remedy those claims. At no point did the Court (Kavanewsky, J.) or Attorney Mastronardi advise Petitioner of his appellate rights or provide him with the forms necessary to initiate an appeal. See Ex. A, PA6.[12]

36. On January 7, 2002, Petitioner filed an Application for Appointment of Counsel related to his habeas petition. By letter dated March 6, 2002, Petitioner learned that an attorney within the Office of Public Defender Office's Habeas Unit had been assigned the case.

---

which was appended to Petitioner's pro se state habeas petition as Exhibit G, has been redacted to remove Petitioner's date of birth, social security number, legal address and home telephone number.

[12] Under Connecticut practice rules, courts are only obliged to notify (a) defendants convicted after trial and (b) habeas petitioners convicted of a crime and faced with an adverse decision of their right to appeal. CT Practice Book § 43-30. This is done "immediately" and "in writing." Id. Concurrently, where a defendant is convicted via guilty plea, Connecticut law contains no presumptive waiver of one's right to appeal.

37.  On or about May 16, 2002, the Habeas Unit assigned representation to Attorney Kenneth P. Fox of New Haven, as a Special Public Defender.  Attorney Fox entered an appearance in lieu of the Public Defender's Office, on June 18, 2002.  Attorney Fox met with Petitioner soon after his appointment, advising that Petitioner had a good habeas case.  Ex. A, PA6.

**38.**  On June 5, 2002, this Court held a conference to inquire about the status of Petitioner's state habeas petition.  Petitioner was instructed that if he wanted the merits of his claim reviewed, he must inform the Court concerning the conclusion of the state proceedings within 30 days thereof.  (See Doc. 12).

39.  On August 18, 2003, Petitioner's state habeas petition was transferred from the Hartford to the Tolland Judicial District, that is, to Rockville Superior Court.  The docket number remained unchanged.

40.  On or about September 22, 2003, Petitioner wrote Attorney Fox asking that the amended petition make an issue of, inter alia, trial counsel's effectiveness relative to his failure to investigate and properly prepare for trial.  Ex. E, PA53-54.

41.  On or about September 26, 2003, Petitioner wrote Attorney Fox providing draft arguments, including case citations and analysis, relative to claims to be raised through an amended petition.  Ex. F, PA55-60.  One of the issues presented was whether Petitioner's plea was voluntary and constituted a due process violation.

41.  On information and belief, on or about November 13, 2003, Attorney Fox drafted a portion of a First Amended Petition on Petitioner's behalf.  On information and belief, said amended petition was never completed nor filed.

42. On November 14, 2003, Attorney Fox filed a Motion for Permission to Withdraw as Counsel Pursuant to the "Anders" Doctrine, with supporting memorandum. Ex. G, PA61-67.[13] As reflected therein, it appears that Attorney Fox's that Petitioner's claims had "no credible basis", were "frivolous and entirely without merit" derives largely, if not exclusively, from review of "all witness statements and police reports and other materials obtained by Attorneys Hankins and Mastronadri." Id.; PA65. There is no evidence that Attorney Fox's investigation into meritorious bases for habeas relief extended beyond requesting and reviewing the record and case file materials, meeting once with Petitioner shortly after his appointment and speaking with defense counsel by phone.

43. Attorney Fox's motion/memorandum noted, but did not address, Petitioner's claim regarding Attorney Mastronardi's failure to raise "'cultural' factors," subsuming that issue into the question of whether Petitioner required a Haitian Creole translator. Ex. G, PA64-65.

44. Attorney Fox 'concluded' that "there is no reasonable basis to risk going to trial by jury in the hope of obtaining conviction to a lesser offense." Ex. G, PA65-66. Notably, Attorney Fox cited no evidence of Attorney Mastronardi and Petitioner engaging in a 'cost-benefit'/'risk-reward' type analysis. In reality, no such discussion ever took place, either between Petitioner and Attorney Mastronardi or between Petitioner and Attorney Fox. Ex. A, PA6.

45. On November 16, 2003, Attorney Fox wrote Petitioner concerning the motion and summarizing his rationale. Ex. H, PA83.

---

[13] As the Court can see, Attorney Fox's Motion was filed under seal, as were later, associated pleadings and rulings. On Petitioner's motion, the Connecticut Appellate Court ordered all relevant documents unsealed, and they were included in the appendix to Petitioner's state habeas appeal brief (infra), which was not filed under seal. Said another way, the previously sealed documents appended hereto are now part of the public record. Respondent's counsel sees no issue with their inclusion herein.

46. On or about December 12, 2003, Petitioner filed pro se an Objection to Attorney Fox's Motion. Ex. I, PA84-90.[14]

47. On or about April 14, 2004, Attorney Fox filed a Supplement to the Motion for Permission to Withdraw; he submitted the transcript from the change of plea hearing. Ex. J, PA91-103.

48. On or about April 21, 2004, the state habeas court (Kaplan, J.) issued a Judgment, with Memorandum of Decision, granting the motion and dismissing the habeas petition sua sponte. Ex. K, PA104-09. The Court identified only two issues raised through Petitioner's original, pro se filing: ineffective assistance of counsel and inadequate advice regarding possible immigration consequences. Id.[15] The Court agreed with Attorney Fox and found that Petitioner had failed to present any non-frivolous claims (pro se). In so ruling, the Court denied Petitioner the evidentiary hearing (trial) afforded habeas petitioners as a matter of right in Connecticut.[16]

49. On or about April 27, 2004, Petitioner filed pro se a petition for certification to appeal the state habeas judgment and an application for fee waiver/appointment of counsel, both which the Court (Kaplan, J.) granted.

**50.** On March 22, 2006, this Court sua sponte vacated its prior Order staying the instant action (Doc. 4) and dismissed it based on the mistaken belief that Petitioner's state habeas efforts

---

[14]  Petitioner must apologize for confusion in the attachments. Exhibit I was to start on page 84. However, the printer placed the "I" label on page 89. Thus, a portion of Exhibit I (pages 84-88) are contained on the .pdf attachment for Exhibit H. The undersigned was unable to remedy this problem during regular business and does not possess a scanner, so as to correct it.

[15]  But see, Oliphant v. Commr. of Correction, 877 A.2d 761, 766, 274 Conn. 563, 569 (2005) ("It is the established policy of the Connecticut courts to be solicitous of pro se litigants and when it does not interfere with the rights of other parties to construe the rules of practice liberally in favor of the pro se party. The modern trend is to construe pleadings broadly and realistically, rather than narrowly and technically.") (citation omitted).

[16]  See Harris v. Commr. of Correction, 947 A.2d 435, 108 Conn.App. 201 (2008)

had concluded approximately four years prior; that he had failed to exhaust state remedies; and that the he not complied with the Court's 30-day order.  (Doc. 12).

**51.**  On or about June 9, 2006, Petitioner moved pro se to reopen the instant action or, alternatively, to renew the stay.  (Doc. 13).

**52.**  By Ruling and Order dated July 17, 2006, this Court declined to reopen the case or re-impose the stay, directing instead that Petitioner re-file a Motion to Reopen at the conclusion of the state proceedings.  Petitioner's motion was denied without prejudice.  (Doc. 14).

53.  On or about October 3, 2006, Petitioner filed his principal state habeas appeal brief through which he sought to have both the dismissal of his pro se petition and the granting of habeas counsel's withdrawal motion vacated, and to have the matter remanded with an order for new counsel.  In support of this prayer for relief, Petitioner cited to, inter alia, prevailing federal constitutional standards regarding representation of trial counsel and regarding the adequacy and voluntariness of guilty pleas.  The Respondent filed a brief on or about December 15, 2006, to which Petitioner replied on or about January 4, 2007.

54.  On September 11, 2007, the Connecticut Appellate Court affirmed the state habeas court (para. 48, ante).  Lorthe v. Commr. of Correction, 103 Conn. App. 662, 931 A.2d 348 (2007).  It did pursuant to de novo review.

55.  On November 26, 2007, the Connecticut Supreme Court denied a petition for certification to appeal.  Lorthe v. Commr. of Correction, 284 Conn. 939, 937 A.2d 696 (2007).

**56.**  On December 21, 2007, Petition mailed his pro se Motion to Reopen the instant case, which was filed on January 7, 2008 (Doc. 15) and granted on January 23, 2008 (Doc. 17).  This amended petition follows.

<u>GROUNDS FOR RELIEF</u>

57.  Paragraphs 1 to 56 are incorporated herein by reference.

58.  Petitioner's confinement is unlawful because the judgment of conviction and court order committing him to the custody of the Commissioner of Correction, as overseen by the Respondent, rests upon the deprivation of his constitutional right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution.

(a)  Trial counsel failed to conduct a sufficient investigation into the circumstances surrounding Petitioner's case.

(b)  Trial counsel failed to explore all avenues that might lead to facts relevant to the merits of Petitioner's case.

(c)  Trial counsel failed in his duty to investigate regardless of any statements that Petitioner, or others, may have made to the police.

(d)  Trial counsel failed to adequately advise Petitioner concerning various potential defenses.

(e)  Trial counsel did not adequately advise Petitioner concerning the consequences of the proposed guilty plea.

(f)  To the extent that Petitioner did change his plea, trial counsel failed to ensure it was done knowingly, intelligently and voluntarily.

(g)  Trial counsel failed to explore all avenues that might lead to facts relevant to mitigation of the penalty, if convicted.

(h)  Trial counsel failed to present relevant mitigating evidence.

(i)  Trial counsel's acts and omissions fell below the standard of reasonable competence in the criminal law.

(j)  But for trial counsel's errors and omissions it is reasonably probable that the result of the trial court proceedings would have been different.  As an example, had trial counsel been competent, it is reasonably probable that, at a minimum, he could have secured a more favorable disposition of Mr. Lorthe's case (i.e., less than 27 years' imprisonment).  It is also reasonably probable that competent trial counsel could have secured a manslaughter conviction, be it via guilty plea or after trial.

59.  Petitioner's confinement is unlawful, in that Petitioner did not actually plead guilty to the charged offense.  The judgment of conviction and court order committing him to the custody of the Commissioner of Correction, as overseen by the Respondent, therefore rests upon the deprivation of his constitutional right to due process under the Fifth and Fourteenth Amendments to the United States Constitution.  Assuming arguendo that "Yes" -- Petitioner's response to the question "How do you plead?" -- may be found to constitute a plea of guilty in the context of the April 16, 2001 proceedings, Petitioner nonetheless was deprived of his due process rights.  The Court put him to plea before making the requisite inquiry to determine whether he was changing his plea knowingly and voluntarily.  The Court also did not personally inquire of Petitioner concerning the elements of the offense or his understanding thereof.  The procedure employed by the Court was legally deficient and unduly coercive.  Moreover, Petitioner did not understand sufficiently the nature of the legal proceedings without the assistance of a Haitian Creole interpreter.

<u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, Todd Bussert verifies under penalty of perjury under the laws of the United States of America, and as a person acting on the Petitioner's behalf, to wit, as Mr. Lorthe's post conviction counsel, that all of the factual averments of this Petition are true and correct, either based upon Mr. Bussert's personal knowledge or upon his personal examination of the pertinent files and records, and other reasonable investigation, as witnessed by his signature below.

WHEREFORE, Henry Lorthe prays that this Honorable Court grant the following relief:

1. After full consideration on the merits, including such expansion of the record, discovery and/or a hearing as the Court may deem appropriate under Section 2254 Rules 7 and 8, issue a writ of habeas corpus vacating Petitioner's guilty plea and setting aside the judgment of conviction.

2. Grant such other or further relief pursuant to 28 U.S.C. § 2254 as law and justice require.

Respectfully submitted,
THE PETITIONER


_____/s/ Todd Bussert_____

By:    TODD BUSSERT, CT24328
       103 Whitney Avenue, Suite 4
       New Haven, CT 06510-1229
       (203) 495-9790; Fax: (203) 495-9795
       tbussert@bussertlaw.com

       Attorney for Petitioner

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 25, 2008, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  In particular a copy will be mailed to:

> Henry Lorthe, #242-168
> McDougall Correctional Institution
> 1153 East Street South
> Suffield, CT 06080-0002

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

A courtesy copy will also be mailed to Chambers.


          /s/ Todd Bussert
Todd A. Bussert

EXHIBIT LIST

Affidavit of Yves Henry Lorthe ............................................................................ A

3-29-00 Statement of Yves Henry Lorthe .......................................................... B

<u>Pro Se</u> Petition for Writ of Habeas Corpus ...................................................... C
      11-5-2001 Ltr. from PD Susan Hankins
      7-11-00 Fee Agreement between Attorney Mastronardi and the Lorthes
      8-29-01 Ltr. from Attorney Mastronardi
      11-24-00 Ltr. from Attorney Mastronardi to Ken Selig, M.D.
      1-2-01 Ltr. Report from Ken Selig, M.D. to Attorney Mastronardi
      2-23-01 Ltr. from Attorney Mastronardi
      Presentence Investigation Report

12-4-01 Ltr. from Attorney Mastronardi re: Grievance Complaint ..................... D

9-22-03 Ltr. to Attorney Fox................................................................................ E

9-26-03 Ltr. to Attorney Fox................................................................................ F

11-14-03 Motion for Leave to Withdraw Appearance.......................................... G
      6-13-01 Sentencing Hrg. Transcript

11-16-03 Ltr. from Attorney Fox ......................................................................... H

12-12-03 Objection to Motion for Leave to Withdraw Appearance..................... I

4-14-04 Supplement to Motion for Leave to Withdraw Appearance ................... J
      4-16-01 Change of Plea Hrg. Transcript

4-21-04 Memorandum of Decision re: Motion to Withdraw, with Judgment ...... K