A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

HENRY LORTHE, Inmate No. 281-693          :
McDougall Correctional Institution
Suffield, Connecticut                        :

     Petitioner,                  :

                                     **CIVIL ACTION NO.**
     v.                    :
                                     **3:01-CV-001479-AWT**
WARDEN,                        :

     Respondent.               :

### DECLARATION OF YVES HENRY LORTHE

1. I am the petitioner in this matter.

2. I am imprisoned at the McDougall Correctional Institution in Suffield, Connecticut. My inmate number is 281-693.

3. I am serving a 27-year term of imprisonment following a conviction before the Superior Court of Connecticut for the Judicial District of Stamford/Norwalk under Docket No. CR00-0132150-S. I stand convicted of Murder in violation of Connecticut General Statutes Section 53a-54a. The conviction relates to the stabbing death of my cousin Jean Rene Bernadel on March 29, 2000.

4. I have never been married. I believe that I may have one child, a daughter approximately age eight. I have never seen her.

5. I am not an American citizen. I have come to learn that as a result of my conviction, I am subject to removal from the United States upon my release from Department of Correction custody.

6. I was born in Fond-des-Blanc, Haiti and grew up in Port-au-Prince, where I lived until age 16.

*Y.H.L*

-1-

7. Creole is my native tongue. I understand but do not speak French. I understand and speak English, better today then when I first moved to the United States. I do not feel confident in my understanding of courtroom English.

8. My father, Ernest Lorthe, moved to Stamford, Connecticut when I was two years old, and I did not see him again until I was 13.

9. My mother, Mimose Lorthe, did not work. She is my world, my mother and my father.

10. As a student, I was alright. I had a problem learning, though. My reading is not that good, and my math is bad. I also have problems remembering things.

11. Our house in Port-au-Prince was an approximate 12 foot by 12 foot room divided by something like a piece of sheet rock. It was one of four units in a one-story apartment building. I lived there with my mother, my brother and two sisters, my auntie and my cousin. There was no plumbing; we used an outhouse. There was also no stove; we had a fire pit outside. There was no electricity. We had two beds; however, we mostly slept on the floor as it was safer to stay low and avoid flying bullets.

12. As long as I can remember, there was violence in Port-au-Prince and around my neighborhood.

(a) Street gangs fought constantly and harmed people, and there were government-related clashes. When Baby Doc left in 1986, the Republican Guard tortured people. I remember large mobs chasing people down, beating them, placing tires doused with gasoline around their necks and lighting them on fire. Members of street gangs would go to people's houses wearing masks, stealing and raping women. They would knock on the door and say, "Open up or we'll kill everyone inside."

*Y. HL*

(b) There was violence on every street. Each street had a different group and different issues. Groups with political affiliations would go street-by-street to search for people. There were often shoot-outs.

(c) I remember seeing people attacked with machetes in the early 90s. It was really bad if you stole something. People would be cut and even burned for stealing.

(d) All of my friends fought. Growing up, people didn't walk away from confrontations. If someone was disrespectful, things escalated more quickly.

(e) Many times I have seen people shot. And, many times I saw dead bodies lying around the streets.

(f) School, which was 20 minutes from home, would sometimes close for months because of the violence.

(g) Port-au-Prince was a war zone, and I lived in fear.

13. In Haiti, you live by principle. One such principle is do not steal. Another is do not disrespect another person's parents or spouse. In Haiti, when people disrespect you they usually also go after you physically, so you are always prepared to defend yourself.

14. Adjusting to life in the United States was difficult. I moved to Connecticut in the tenth grade. It was beautiful, peaceful. However, I did not adapt quickly to the new culture and environment. I was expelled from school for getting in a fight after being jumped by a group of guys. I finished high school with the assistance of a Creole-speaking home tutor.

15. Although I believe he grew up in Connecticut, my cousin Jean Rene Berndael, who we called Biggie, was like a brother to me. He was close to me and my family. For instance, Biggie took my father to doctor appointments and would translate for him.

16. Biggie's death is something I regret. As best as I can explain it, I snapped due to the disrespect Biggie showed my parents, especially in hitting my mother. Before he got into his car to leave our house, Biggie said he was going to kill me. That, and the disrespect shown my parents, is the reason I got out of my car with knives in hand asking Biggie whether he still intended to kill me. When I left to try and cool off, I believe there were people following me, who I lost. I then saw Biggie arguing with my mother. I got angry and blanked out.

17. It has always been like that. When I get angry, I blank out. That night was the worst ever.

18. My family hired Attorney Gary Mastronardi to represent me. There is no way I could have afforded to hire him myself.

19. I met with Attorney Mastronardi three times during the approximate 11 months he represented me, each time at the courthouse in Stamford.

(a) The first meeting was after my parents hired him -- I believe at my August 23, 2000 court appearance. That meeting was not even 20 minutes. We spoke over a telephone in the visiting room. I remember that he introduced himself and said he would see me upstairs.

(b) The second meeting was for approximately 15 minutes before I appeared at the change of plea hearing. I remember that Attorney Mastronardi had me sign some papers. I have no idea what they were for. Before that hearing, I understood that my name was on the board for trial. Attorney Mastronardi advised me to plead guilty, telling me I would get 60 years if I didn't. Attorney Mastronardi never said anything that suggested he would take the case to trial if that is what I wanted to do. He told me that I would lose if I went to trial.

Y.H.L

(c)  The last meeting was for approximately 20 minutes the morning of my sentencing hearing.

(d)  There were times that my case was set down for court, where I was brought to the courthouse but not brought into the courtroom.  I did not see Attorney Mastronardi on those occasions.

(e)  Attorney Mastronardi never came to visit me at the prison in which I was housed.

*Y.H.L*                                                                                        *AFTER THE CHANGE OF PLEA HEARING,*

(f)  I believe that I called Attorney Mastronardi one time.  ~~I do not recall if I spoke~~
*WE SPOKE ~~VERY~~ BRIEFLY ABOUT DEPORTATION ISSUES RELATED TO MY CONVICTION.*
~~do him, but if I did, I don't believe it was for more than five minutes.~~

20.  At the change of plea hearing, Attorney Mastronardi repeatedly told me what to say. That is why I said "Yes" when asked how I pled.  It is what I understood Attorney Mastronardi wanted me to say.

21.  I have never thought that I committed murder, as I have understood the law to define that offense.  I always thought that mine is a case of manslaughter, as I have understood the law to define that offense.

22.  I met with Dr. Kenneth Selig, whom I understood from Attorney Mastronardi that my parents had paid for.  I question whether I actually spent one hour and 15 minutes with Dr. Selig, as he wrote in his letter to Attorney Mastronardi.  Either way, I remember that he did not ask me anything about what happened that day I killed Biggie or about how I grew up.  I do remember that he asked about school and about my feelings toward homosexuals and living in a cell with them.

*Y.H.L*

-5-

23. At no point did the Court or Attorney Mastronardi advise me of my right or ability to appeal. Attorney Mastronardi did tell me to do good in jail, wait a few years and then file for a sentence modification.

24. I met Attorney Fox shortly after he was appointed to represent me in the state habeas case. He came to visit me at the prison. I remember that Attorney Fox told me I had a good case on habeas.

25. Attorney Fox did not meet with me after that even though he wrote saying he was going to. I wanted to see Attorney Fox to discuss different issues. I don't know the law, and I cannot write English well. I wanted to talk about things like my supposed guilty plea.

26. I did send Attorney Fox letters regarding issues I wanted to see raised through the amended habeas petition.

27. I never told Attorney Fox that I pled guilty because I was afraid of going to trial. Attorney Fox and I never discussed that issue or anything related to it. In fact, I never really talked about going to trial with Attorney Mastronardi because he was telling me to plead guilty. Only Attorney Susan Hankins said that she would take the case to trial.

28. My attorney, Todd Bussert, having read the above over to me, I affirm, under penalty of perjury, that it is true and correct to the best of my knowledge and understanding.

Dated:     June 24, 2008
           Suffield, Connecticut


                                    _Lorthe Henry_
                                    Yves Henry Lorthe