THE LAW FIRM OF
# GARY A. MASTRONARDI
2112 NORTH AVENUE
BRIDGEPORT, CONNECTICUT 06604

(203) 368-0411

GARY A. MASTRONARDI*

EDWARD T. MURNANE, JR.*
*ALSO ADMITTED TO
PRACTICE IN NEW YORK

FAX (203) 368-6875

D

December 4, 2001

Attorney George J. Ferrio
1087 Broad Street
Bridgeport, CT 06604

        Re: <u>Lorthe v. Mastronardi</u>
           Grievance Complaint # 01-0464

Dear Mr. Ferrio:

  I am in receipt of a grievance complaint filed against me by Henry Lorthe. In his complaint, Mr. Lorthe claims that, in representing him in his criminal case, I violated Disciplinary Rule 1.16 in that, after being advised by Mr. Lorthe's family that they could not afford to make the payments due me under our fee agreement, I "should have terminated representation…to protect [Mr. Lorthe's] interests." He further claims that "Measures to secure [Lorthe's] defense of mitigating circumstances should have been taken [by me] before ill advising [Mr. Lorthe] into a guilty plea." In effect, he claims that because only two-thirds of the initial $15,000.00 pretrial fee due under the agreement was actually paid, he was somehow denied adequate representation by me.

  I was retained by Henry Lorthe's father, Ernest Lorthe, on or about July 11, 2000, to represent his son, Henry, in a murder case which was pending in Stamford Superior Court. In that case, the state's evidence was that after a brief argument between Mr. Lorthe and his cousin, which occurred at Mr. Lorthe's home in Stamford in March of 2000, the cousin left the scene and drove to an area near a housing project in Stamford. Immediately after the cousin left Mr. Lorthe's home, Mr. Lorthe went to the kitchen, took two large kitchen knives, exited the Lorthe home, entered his car, and proceeded to the housing project looking for his cousin. Thereafter, when Mr. Lorthe found his cousin, he proceeded, with a knife in each hand, to chase his cousin around an open area near the project. When his cousin fell to the ground during the chase, Henry jumped on him and plunged one of the knives deep into his cousin's chest killing him on the spot. While I do not recall the <u>exact</u> number of witnesses, I am absolutely certain that there were

at least <u>five</u> eyewitnesses to the event all of whom had given the state sworn statements describing what had occurred. Also, shortly after the event, Henry was arrested and, at that time, gave a full confession of what he had done to the Stamford police.

When I first came into the case, I obtained his file from the public defender who, up until that time, had been representing Mr. Lorthe. The public defender, Ms. Susan Hankins, advised me that, in her opinion, the case should resolve itself with a manslaughter (rather than murder) plea, and a sentence of somewhere between ten and twenty years. Sometime thereafter, I met with Assistant State's Attorney David Cohen, the prosecutor handling the case. It was Mr. Cohen's position at that time -- and at all times thereafter -- that any disposition in the case would have to begin with Mr. Lorthe's agreement to plead guilty to murder, not manslaughter. Murder carries with it a mandatory minimum penalty of not less than twenty-five years. On several occasions during the pendency of the case, I attempted to convince Mr. Cohen to permit Mr. Lorthe to plead guilty to something less than a murder charge, but he flatly refused to do so. I also specifically asked Mr. Cohen if, during the early stages of the case, while Mr. Lorthe was still represented by a public defender, he had ever offered Mr. Lorthe, through the public defender, the option of pleading guilty to a manslaughter charge. Mr. Cohen's response was a clear and unequivocal "no". He also produced for my review, and for review by Mr. Lorthe, a written request by the murder victim's family that Henry Lorthe receive the heaviest sentence possible under the law, including a life sentence if that were available to the sentencing judge.

With all of this in mind, I decided nonetheless to explore the possibility of trying the case as a murder case, but with the hope of obtaining a manslaughter conviction from a jury. To do this, I sought the assistance of Kenneth Selig, a forensic psychiatrist. Mr. Lorthe's parents, who were fully aware of this potential strategy, provided the funds to retain Dr. Selig for the examination.

After an examination of Henry Lorthe by Dr. Selig, Dr. Selig concluded that:

1. Henry Lorthe was not legally insane at the time of the offense; and

2. That we "would have a very hard time sustaining a defense of extreme emotional disturbance;" (i.e., obtaining a manslaughter conviction in the face of a murder charge).

Dr. Selig observed that "There is no doubt that Mr. Lorthe has problems controlling his anger, and has a tendency to get enraged and then feel remorseful afterwards, but this would not constitute a defense." (emphasis added). And finally, while Mr. Lorthe is correct in his assertion that Dr. Selig admitted the possibility of "brain damage" as a mitigating factor, what Mr. Lorthe fails to point out are Dr. Selig's opinions regarding the likelihood that such brain damage actually existed:

> "[Lorthe] does report a past history of numerous head injuries, although he has never lost consciousness, and I do not find any significant cognitive problems during my interview.
>
> \*        \*        \*
>
> "Whether or not you wish to pursue this matter is your decision, but it is my judgment that after we got through with all of that testing, there is a low likelihood that we would find evidence of brain damage. This is particularly the case since there is no evidence from his school records that he was significantly cognitively impaired."

(emphasis added).

In light of Dr. Selig's report, and because I believed at the time -- and still do at this time -- that I would not prevail at trial in establishing the elements of manslaughter, and because I also believed that, if convicted of murder, given the violent nature of the crime and the position of the victim's family regarding Mr. Lorthe's sentence, a substantial risk existed that Mr. Lorthe could receive a sentence well in excess of thirty years incarceration, I advised Mr. Lorthe that he should plead guilty to the murder charge under the terms and conditions described in my letter to Mr. Lorthe. In his grievance complaint, Mr. Lorthe correctly points out that, at one point during the plea negotiations with Mr. Cohen and Judge Kavanewsky, which occurred prior to February 23, 2001, I told Lorthe that the judge was willing to impose a sentence of 25 rather than the 27 years ultimately imposed by Judge Kavanewsky. In fact, that 25-year offer was conveyed to Mr.

Lorthe by me in my February 23, 2001 letter. What Mr. Lorthe fails to point out in his complaint, however, is that shortly after the date of my letter, at a final pretrial with Judge Kavanewsky, the judge pointed out to me that I had apparently misunderstood him in our previous plea discussion. He told me that he was only willing to permit me to <u>argue</u> for the mandatory minimum of 25 years at the time of Mr. Lorthe's sentencing. The judge explained that, in pleading guilty, Mr. Lorthe would actually have to accept a sentence which was "capped" at thirty years with Mr. Lorthe's right to argue to the judge that he should receive something less than thirty years. All of this was explained to Mr. Lorthe by me after the date of my letter, but <u>prior</u> to the date on which he actually entered his guilty plea -- and it was also explained to him by the judge on the record at the time of his plea. (Not surprisingly, Mr. Lorthe's complaint does not mention what happened at his plea allocution. Nor does Mr. Lorthe attach a copy of the transcript of his plea for support of his claims). Therefore, Mr. Lorthe's claim that the judge gave him a sentence of more than what I promised him he would receive is false because it only tells half the story. Again, prior to his entering his plea, Mr. Lorthe knew full well that his "deal" was "thirty years with a right to argue for less." The judge ultimately sentenced him to 27 years -- i.e., only two years over the mandatory <u>minimum</u>.

   For other reasons, moreover, Mr. Lorthe's failure to attach the minutes of his plea hearing to his complaint is significant. For example, he suggests in his complaint that he has "language problems." I never had problems understanding Mr. Lorthe, Dr. Selig never reported such problems, Ms. Hankins, his public defender, never indicated such a problem, the police apparently had no problem understanding him when he confessed to the crime, and, at the times he appeared in court, including his plea and sentencing proceedings, Mr. Lorthe never once saw the need to request an interpreter. It is also noteworthy that Mr. Lorthe attended school in this country. As another example, he claims in his grievance complaint that he did not know that conviction in this case could result in deportation. This is utter nonsense. My recollection is that, at the time of his plea, Mr. Lorthe was specifically advised of the possibility of deportation by Judge Kavanewsky. And, quite significantly, Mr. Lorthe told me during the plea negotiations that if the state would offer him the right number, he would agree to "voluntary deportation". There is <u>no</u> question at all, therefore, that Mr. Lorthe was fully aware of the implications of his plea as regards "deportation" at the time he entered his plea.

   Finally, I would like to say this. By the time of his plea, Mr. Lorthe had had ample time (at least a month) to consider whether or not to accept the state's plea offer. He had also had

plenty of time to review the papers in his case and, in particular, Dr. Selig's report. At no time did either he or any member of his family ever indicate to me that he wished to pursue with Dr. Selig the "brain defect" claim which he now says I should have pursued but failed to do so for lack of funds. In fact, both he and his family knew full well that pursuing this claim would in all likelihood be a monumental waste of time and money. Also, at no time did his family ever tell me that they would not or could not pay me in the future. In fact, when I met with his parents at my office to discuss Dr. Selig's report, they also agreed that it would not be worth it to pursue the "physical defect" claim any further. As I view things, Ernest Lorthe still owes me $5,000.00, but it has always been my business policy <u>not</u> to sue clients for money owed. Therefore, I ask that my failure to pursue Mr. Lorthe for the balance due not be construed against me.

In short, Henry Lorthe's primary complaint here is not that I did not pursue every avenue available to the defense in representing him due to lack of funds, but that I was not able to convince the prosecutor to offer him the "manslaughter" plea. I did the best I could for Mr. Lorthe within the confines of the rules of practice and evidence. Money was <u>never</u> a critical issue.

Very truly yours,

Gary A. Mastronardi

GAM/jmb