G

| | |
|---|---|
| CV 01-813116-S | Superior Court |
| Yves Henry Lorthe | Judicial District of Tolland |
| v | at Rockville / Habeas |
| Warden, State Prison | November 14, 2003 |

# To Be Filed Under Seal

### Motion for Leave to Withdraw Appearance pursuant to the "Anders" Doctrine, and Memorandum of Law in Support Thereof, pursuant to Practice Book § 23-41

The undersigned, attorney for the petitioner, seeks this Court's permission to withdraw his appearance, and in support thereof respectfully states:

The petitioner was the defendant in case: CR 00-132150, in Superior Court - Stamford, charged with murder, in violation of C.G.S. § 53a-54a. Petitioner was represented initially by Attorney Susan Hankins of the Office of the Public Defender. Attorney Hankins engaged in discussion with the Office of the State's Attorney concerning a possible plea agreement, including the possibility that the petitioner might be willing to plead to manslaughter in consideration of a sentence of twenty years' incarceration.

Petitioner and his family privately retained Attorney Gary Mastronardi,

1

who took over from Attorney Hankins. Attorney Mastronardi arranged for petitioner to be evaluated by psychiatrist Kenneth Selig. Dr. Selig examined the petitioner and reported that there was no significant basis for claims of mental disease or defect, or of extreme emotional disturbance. Dr. Selig evaluated the possibility that MRI exam and other neurological testing might substantiate brain damage sustained by petitioner earlier in life and concluded that it was unlikely that brain damage of significance for petitioner's criminal case would be substantiated.

Attorney Mastronardi entered into plea bargaining with the State and learned that because of demands from the victim's family for strenuous prosecution and severe punishment, the State was unwilling to agree to any charge other than murder, carrying a minimum sentence of twenty-five years' incarceration. Attorney Mastronardi communicated this information to the petitioner, indicating that the best resolution he could obtain would be a sentence of twenty-five years' incarceration.

Subsequently, Attorney Mastronardi indicated to petitioner that the twenty-five year offer was an error on his part. The Judge had indicated to Attorney Mastronardi that the offer he would allow would be for "cap" of thirty years' incarceration, with the right to argue for less, in exchange for petitioner's guilty plea to murder.

2

On April 16, 2001, petitioner entered a plea of guilty, pursuant to the plea agreement. On June 13, 2001, Attorney Mastronardi argued for a sentence of less than thirty years and the Court sentenced petitioner to twenty-seven years' incarceration, which conformed to the plea agreement. There was some confusion over the pre-sentence investigation report, as to whether the petitioner felt remorse for what he had done. However he did apologize in open court and express remorse. The victim was in fact petitioner's cousin, although it would appear that they had never been close emotionally.

Subsequently, petitioner filed a pro se habeas petition in which he alleged various claims of ineffective assistance by Attorney Mastronardi. He alleged that the psychiatric evaluation Attorney Mastronardi obtained was inadequate; that the failure to obtain MRI and EEG tests represented ineffective assistance; and that petitioner believed when he pled that the plea agreement was for twenty-five years' incarceration.

Petitioner had previously filed a grievance against Attorney Mastronardi. In response to similar allegations in the grievance statement, Attorney Mastronardi made clear that Dr. Selig's evaluation was complete and authoritative; that there was no reasonable basis for obtaining MRI and other tests; and that the original error about the plea offer was corrected,

3

such that on the day of pleading petitioner was clear that the offer was for a cap of thirty years with the right to argue for less.

In addition, in his habeas petition, petitioner claimed that because his parents had not paid Attorney Mastronardi the entire fee agreed upon, Attorney Mastronardi has a duty to withdraw as his counsel, after which the Office of the Public Defender would resume representing him. The Office of the Public Defender would then have obtained MRI and other tests and successfully defended him on the basis of brain damage. This claim had also been raised in petitioner's grievance. Attorney Mastronardi suggested in his response to the grievance that such a claim was preposterous.

Also, in his habeas petition, petitioner indicated that Attorney Mastronardi ought to have raised "cultural" factors relating to petitioner's origins in Haiti, that might be the basis for defenses to the murder charge. Petitioner also suggested that he did not understand what was happening at the plea hearing because he failed to complete high school and had a poor understanding of English and should have been provided a Haitian Creole interpreter. These claims were also raised in the grievance. Attorney Mastronardi responded to the grievance by stating that he never had any indication, in dealing with petitioner, that he did not understand what was being said to him, or that his own statements, in English, were not fully

4

intended and comprehended by him. The undersigned would also indicate that in his dealings with petitioner there has never been a suggestion by the petitioner that an interpreter was needed, or that he did not understand conversations, letters and documents in English.

Petitioner also claimed in the habeas petition and in his grievance that he was not advised that non-citizens might become subject to immigration consequences if convicted of murder. Again Attorney Mastronardi responded that this was incorrect, that the plea canvass included the non-citizen advisement.

Given all of the above, it is the conclusion of the undersigned that there is no credible basis for claiming ineffective assistance of counsel against either Attorney Hankins or Attorney Mastronardi. Petitioner's claims are frivolous and entirely without merit. It must be noted that in addition to overwhelming evidence of numerous witnesses to the offense, the petitioner himself freely admitted to the offense. His chief hope appears to have been that if the case had gone to trial, it might have been possible to convince a jury to convict him only of manslaughter, leading to a lesser sentence. Having reviewed all witness statements and police reports and other materials obtained by Attorneys Hankins and Mastronardi, it is the undersigned's conclusion that there is no reasonable basis to risk going to

5

trial by jury in the hope of obtaining conviction to a lesser offense. The off-setting danger of being convicted of murder and being sentenced to a far longer period of incarceration than twenty-seven years was too great a risk to make taking the case to trial a reasonable representation strategy.

**"Anders" Doctrine and Conclusion**

Connecticut law parallels and invokes the federal case law of Anders v. California, in holding that if counsel concludes, after conscientious investigation and analysis, that a habeas claim is without merit and, or, wholly frivolous, counsel must so advise the Court and request permission to withdraw. Franko v. Bronson, 19 Conn. App. 686 (1989) (following Anders v. California, 386 U.S. 738 (1967)). Based upon the investigation and analysis detailed above, the undersigned concludes that claims of ineffective assistance of counsel against Attorneys Hankins and Mastronardi in their representation of the petitioner would be frivolous and without merit . The undersigned therefore requests this Court's permission to withdraw his appearance on behalf of the petitioner.

Petitioner has been noticed of this motion to withdraw and shall have thirty days to respond in writing, including stating an objection to the withdrawal. If an objection is filed, he shall have the right to a hearing, at

**6**

which this Court may, in its discretion, deny the request to withdraw, or

authorize him to proceed pro se, should the request to withdraw be granted.

**WHEREFORE**, for the foregoing reasons, counsel requests this Court's

permission to withdraw his appearance.

Respectfully,

Kenneth Paul Fox, Attorney for Petitioner
Special Public Defender
627 Quinnipiac Avenue
New Haven, CT 06513
(203) 931-3316
fax: (203) 466-8262
Juris No. 409753

**Order**

The foregoing having been considered, petitioner's counsel's motion to
withdraw his appearance in this habeas corpus case is hereby ordered:

Granted    /    Denied

By_____
Judge of the Superior Court

**Certification**

The undersigned hereby signifies that a copy of the foregoing was mailed,
first class postage prepaid, on November ~~12~~ 15, 2003, to:

**Mr. Yves Henry Lorthe**
**No. 281693**
**MacDougall C. I.**
**1153 East Street South**
**Suffield, CT 06078**

, Kenneth Paul Fox

7

| | | |
|---|---|---|
| CR-000132150 S | : | SUPERIOR COURT |
| STATE OF CONNECTICUT | : | STAMFORD/NORWALK J.D. |
| VS | : | AT STAMFORD |
| HENRY LORTHE | : | JUNE 13, 2001 |

B E F O R E:

       THE HON. JOHN F. KAVANEWSKY, JR., JUDGE

A P P E A R A N C E S:

       DAVID COHEN, ESQ.
         Assistant State's Attorney

       GARY MASTRONARDI, ESQ.
         Attorney for the Defendant

                       ALFRED DEVITO
                       Court Monitor

1

1          THE COURT:  Mr. Cohen, you can call the next

2     matter.

3          MR. COHEN:  Your Honor, the next matter is

4     Henry Lorthe.  If we could have him brought out

5     please?

6          (brief pause)

7          THE COURT:  All right, this is Mr. Henry

8     Lorthe.  He stands here with counsel, Mr.

9     Mastronardi.  Now before we go forward, this

10    matter is down for sentencing today.  I think I

11    took the plea.  He pled guilty to one count of

12    murder.  There's a mandatory sentence which must

13    be imposed of at least twenty-five years.

14    However, I think we indicated that this was a cap

15    agreement, thirty years.  Mr. Mastronardi would

16    have a right to argue between the thirty and

17    twenty-five.  I read the PSI.  I also read --

18    started to read, I should say -- I'll finish it

19    now before we go forward -- a statement from the

20    defendant submitted to me today and I've asked the

21    clerk --I think she's given copies back to Mr.

22    Mastronardi and Mr. Cohen.

23         Okay, the Victim's Advocate is also here.

24    It's my understanding that a representative of the

25    victim's family has been notified concerning today

26    and that gentleman has not yet appeared.

27         VICTIM'S ADVOCATE:  No, Your Honor, and he

2

1   would --

2          THE COURT:  Okay, what can you tell me

3   concerning that?

4          VICTIM'S ADVOCATE:  Your Honor, when we were

5   in court last on May 31st, he requested a letter

6   for his supervisor explaining that court was

7   continued and sentencing would be held today.  I

8   provided that letter to him and he said he felt it

9   would be sufficient to be here today.  However,

10  he's not present and he has not called me.

11         THE COURT:  All right, are his statements

12  concerning sentencing essentially consistent with

13  the victim's statement in the pre-sentence

14  investigation.

15         VICTIM'S ADVOCATE:  Yes, Your Honor, he's

16  representing the rest of the family who has moved

17  to Florida since this occurred and they have all

18  been in touch with Probation and with myself and

19  they've provided their feelings.

20         THE COURT:  All right, I want to review in

21  more detail Mr. Lorthe's statement here.  I'll do

22  that on the bench, but we'll go off the record a

23  minute.  Have a seat, Mr. Lorthe.

24  (Whereupon there was a brief recess.)

25         THE COURT:  We're back on the record.

26         I've read that and I'm going to attach it as

27  a permanent part of the pre-sentence

3

1   investigation.  I assume counsel would want that.

2       All right, I'm ready to hear sentencing

3   arguments.

4       MR. COHEN:  Thank you, Your Honor.  If the

5   court pleases, as the court indicated, the state

6   is recommending the sentence of thirty years in

7   state's prison in this matter.  The pre-sentence

8   investigation I think really sums up the entire

9   matter here.  This is a fact that a family --

10  obviously the victim's family -- is devastated by

11  the loss of their son for really trivial reasons.

12  The fact that there was a dispute and bad blood

13  does not in any way I think justify the

14  defendant's finding the victim and chasing him,

15  running him down to the ground, so to speak, and

16  then stabbing him with what is described as a

17  twelve inch kitchen knife.  This type of behavior,

18  if the court pleases, for a trivial justification

19  shows us that I think this defendant is a

20  dangerous person and that's why the state is

21  recommending the recommendation that it is making

22  in this case.  Furthermore, the fact that there

23  may have been some extenuating circumstances, a

24  possible insult to the defendant's parents,

25  although that's in dispute and would have been

26  disputed at trial, I think that's taken into

27  consideration in the fact that the state is not

4

1    recommending anywhere near a maximum sentence for

2    this defendant.  Also, the fact that his record

3    was fairly minimal up to this point in his life

4    and I think that's reflected in the fact that the

5    state is making a recommendation which is

6    substantially or fifty percent less than the

7    maximum allowable under law in a situation of this

8    type.  And I think that's already been factored

9    into the recommendation.  Any reduction of the

10   sentence below that I think is uncalled for under

11   these circumstances.

12        Thank you, Your Honor.

13        THE COURT:  All right, Mr. Mastronardi?

14        MR. MASTRONARDI:  Your Honor, I will try to

15   be extremely brief.  I have had the opportunity to

16   review the probation report that was done by

17   Probation Officer Spielman (sp.?).  I have also

18   had the opportunity to review that report at

19   length with my client.  Other than that which is

20   outlined in the statement that was provided to the

21   court with respect to the degree of contriteness

22   felt by my client as a result of what has

23   happened, we don't have any specific objections

24   with the factual information that's set forth in

25   the report.

26        Mr. Lorthe is twenty-three years old.  He

27   stands here before the court today.  As Mr. Cohen

5

1    pointed out, he has no real criminal history of

2    any kind to speak of and so I'm not quite sure how

3    it is that the state can take the position that he

4    is automatically a dangerous person.  At the time

5    of this offense, he had a great deal going for

6    him.  He had had some trouble finishing high

7    school, but he had a work history.  He was not

8    afraid to work.  He was supporting himself,

9    gainfully employed, had his own car.  He comes

10    from an extremely close-knit, very good family,

11    Your Honor.  I have some first hand knowledge of

12    that.  I've seen the amount of support that they

13    have given him throughout this case.  He was

14    raised with a Christian background and he was

15    taught to be respectful toward other people; and

16    throughout his life he was; and he also expected

17    respect in return.  Now Mr. Lorthe is Haitian and

18    in his culture, particular respect should -- he's

19    taught from a child to be particularly respectful

20    to elders, older people.  And he witnessed

21    something here that to him was the act of ultimate

22    disrespect and something that was an anathema to

23    his upbringing.  He saw his cousin, a member of

24    his family, engage in a violent act against his

25    mother and his father.  Now the state can say that

26    that's in dispute, but Mr. Lorthe gave a

27    confession very shortly after, surrendered himself

6

1   voluntarily, gave a confession and explained

2   exactly what had happened -- and this was back on

3   the day of the incident -- and part of his

4   explanation was exactly what Mr. Bernadel (sp.?)

5   had done to his parents. I don't say this, I

6   don't bring this up because it forgives what he

7   did, I don't bring it up to minimize what he did,

8   because he knows that what he did absolutely wrong

9   and he's extremely contrite over it. I bring it

10  up only because I think that it is a mitigating

11  factor.   I have handled a number of homicide

12  cases in my career.  I know Your Honor has sat on

13  a number of homicide cases himself.  Generally,

14  Your Honor, what you see in these cases, what the

15  motivating factor behind the conduct in most of

16  these cases, really there are two.  It's either

17  drugs or it's money, or it's both.  It's rare, not

18  totally beyond the realm of consideration, but

19  it's not normal that you see cases like this occur

20  between family members, problems that occur

21  between family members.  He was very close friends

22  with the victim in this case.  They were cousins,

23  they grew up together.  They lived in the same

24  area.   It's rare that you see situations like that

25  this that are one hundred percent motivated by

26  emotion.  That is the motivating factor here.  It

27  was an emotionally charged situation that occurred

7

1    over a period of several minutes.  And again,
2    while I don't bring this to the court's attention
3    because it forgives what he did, I think at the
4    very least that it is a strong mitigating factor
5    here.  This is a gentleman with, again, no history
6    of this type of behavior, Your Honor.  And so what
7    I'm asking, again, he is extremely sorry over what
8    he has done, knows he did wrong, fully accepts
9    responsibility for what he did.  Again, very
10    shortly, within a very short period of time after
11    this happened.  I mean, he's Haitian, he's not an
12    American citizen.  I suppose he could have hidden
13    and tried to flee to Haiti after this happened.
14    He didn't.  He got into his car, went over to a
15    friend's house and about a half an hour later he
16    got back in his car and drove right to the police
17    station and gave a statement and explained
18    everything that he did and why it was that he did
19    it.  That is I think strongly to his credit.  It
20    shows that he knew he did wrong.  It shows that he
21    fully accepted responsibility for what he did in
22    this instance.
23        I'm asking, Your Honor, the sentencing range
24    here is twenty-five to thirty years, I'm asking --
25    I think that there are enough mitigating
26    circumstances -- this is not -- this case is not
27    your typical homicide case and I think there are

8

1   enough mitigating circumstances here that would
2   warrant the court to impose a sentence that would
3   be on the low side of that five year range.  I
4   think if the court wanted to impose the mandatory
5   minimum or it opted to impose the mandatory
6   minimum in this case, that it would be entirely
7   justified under the circumstances.
8         Now that is all that I have to say.  Mr.
9   Lorthe's father is here.  His mother wanted to be
10  here, but could not find it in herself to sit here
11  and watch this whole situation.  She felt that her
12  emotions would be too overwhelming and was not
13  able or not willing to sit and go through that, so
14  she's not here.  But his father is here and has
15  prepared a few words that he would like to say.
16  He's not fluent in English and so Mr. Lorthe's
17  sister is also here to assist in making the
18  statement.  I'd ask with the court's permission
19  that he be permitted to do that.  It would be a
20  very, very brief statement, maybe a thirty second
21  statement, but he does want the court to know a
22  little bit more about his son.
23        THE COURT:  Call him up here now.
24        MR. MASTRONARDI:  Mr. Lorthe, would you come
25  forward?
26        (brief pause)
27        THE COURT:  And who's the lady that's going

- 76 -

9

1   to be assisting him, what's your name, ma'am?

2   DEFENDANT'S SISTER:  My name is Jean (sp.?)

3   Lorthe.

4   THE COURT:  All right, raise your right hand.

5   Do you swear to interpret for this person who's

6   going to speak into language which this court can

7   understand and be reflected on the record?

8   DEFENDANT'S SISTER:  I do.

9   THE COURT:  All right, put your hand down.

10  MR. MASTRONARDI:  I think what we've got

11  here, he prepared it and you're going to read it,

12  is that the way it's going to be?

13  DEFENDANT'S SISTER:  Yes.

14  MR. MASTRONARDI:  Mr. Lorthe prepared these

15  words and his daughter is going to read them.

16  THE COURT:  All right, I'll hear that.  Go

17  ahead.

18  DEFENDANT'S SISTER:  This letter is --

19  THE COURT:  Speak louder, please.

20  MR. MASTRONARDI:  Speak up, speak louder for

21  me.

22  DEFENDANT'S SISTER:  (as read)  This letter

23  is to help on behalf of our son, Henry.  We are

24  asking for consideration for him.  He was always a

25  good boy.  What happened here is not what our son

26  is.  He is a caring and considerate child who

27  loves spending time with his family.  We know what

10

1    he did was very bad.  But our son is not a hate-

2    filled person.  He always has been a wonderful

3    child.  We are deeply sorry for what he has done.

4    We forgive him.  It is our hope one day that the

5    Bernadel family will always forgive him.  Signed,

6    Mr. and Mrs. Lorthe.

7        THE COURT:  Thank you, you can have a seat,

8    both of you, in the audience.

9        Okay, Mr. Mastronardi, was there anything

10   else you wanted say on behalf of your client

11   today?

12       MR. MASTRONARDI:  Mr. Lorthe prepared a few

13   words he'd like to say before he's sentenced, Your

14   Honor.

15       THE COURT:  All right, Mr. Lorthe?

16       MR. MASTRONARDI:  He's handcuffed, Your

17   Honor.

18       THE COURT:  Can you hold that for him?

19       (brief pause)

20       THE DEFENDANT:  I want to say that I'm very

21   sorry for what I did.  I apologize to the court,

22   to my mother and father.  But most of all, I want

23   say I'm sorry to the Bernadel family.  I hope they

24   can forgive me some day.

25       THE COURT:  All right, thank you.  Is there

26   anything else?

27       MR. MASTRONARDI:  No, Your Honor.

1          THE COURT:  Mr. Cohen, anything else?

2          MR. COHEN:  Nothing further, Your Honor.

3          THE COURT:  All right, I don't pretend to say

4     that I've sat on as many homicide cases or murder

5     cases as other judges.  I haven't.  But I've come

6     to learn in the few years that I've been doing

7     this, that there's probably not a typical homicide

8     case.  They're all different.  They all have their

9     own characters and features.  But what I can say

10    with some certainty having read this, having

11    listened to the factual basis for the plea, Mr.

12    Lorthe, is that this crime was -- it was senseless

13    and it was unprovoked.  It would appear that you

14    and not anybody else was responsible for this and

15    was the aggressor for this crime.  You know, Mr.

16    Mastronardi appears here with you.  He's very

17    credible with this court and he indicates that you

18    had a or were inculcated with a respect for life,

19    a respect for your elders.  It would certainly

20    seem, I think you have to agree, that you have

21    demonstrated a complete lack of respect for life

22    on the date in question.  This gentleman, the

23    victim here, simply did not deserve the fate that

24    you gave him by your actions.  The remorse factor

25    here is dubious.  I'm presented with different

26    versions in the pre-sentence report and the

27    version that your attorney has given me today.  I

12

1    will consider though several factors that are in

2    mitigation.   I think they have been considered

3    substantially by the state in fashioning this

4    plea, but I'm looking at this case de novo within

5    the sentencing range that I've been authorized to

6    by virtue of the plea.   And I do note that you're

7    relatively young.   You have not amassed any

8    significant criminal history.   I think there's a

9    single breach of peace conviction on your record.

10   It would appear that you have not involved

11   yourself with drugs or other like illegal

12   activity.   And it would appear that you have

13   accepted legal responsibility for this offense

14   fairly promptly by virtue of your relatively quick

15   surrender to the authorities and by virtue of this

16   guilty plea made well before trial.   So I am

17   considering all of that on both sides of the

18   equation in fashioning what I hope to be the

19   proper sentence here.   And I'm prepared to

20   sentence.

21        To the charge of murder, you are sentenced to

22   the custody of the Commissioner of Corrections for

23   a term of twenty-seven years.   Any fees and costs

24   are waived.

25        That's all.

26   MR. COHEN:  Thank you, Your Honor.

27   MR. MASTRONARDI:  Thank you, Your Honor.

13

1          THE COURT:  All right, I think that's all

2     that this court is ready for.  I'll stand in a

3     short recess.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CR-000132150 S        :        SUPERIOR COURT

STATE OF CONNECTICUT      :        STAMFORD/NORWALK J.D.

VS                   :        AT STAMFORD

HENRY LORTHE          :        JUNE 13, 2001


C E R T I F I C A T I O N


I, Alfred DeVito, Court Recording Monitor for the Superior Court, Fairfield County, State of Connecticut, do hereby certify that the foregoing is a true and accurate transcription of the tape recorded proceedings had in the above-entitled case.


ALFRED DEVITO
Court Monitor